## FOWLER v. ROSS.

### No. 10850.

United States Court of Appeals

District of Columbia Circuit.

Argued June 19, 1951.

Decided March 27, 1952.

T. Emmett McKenzie, Washington, D. C., with whom Herbert D. Horowitz, Washington, D. C., was on the brief, for appellant.

Joseph A. Sommer, Asst. U. S. Atty., Washington, D. C., with whom George Morris Fay, U. S. Atty. at the time the case was argued, and Joseph M. Howard, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Charles M. Irelan, appointed U. S. Atty. subsequent to the argument in this case, and Richard M. Roberts, Asst. U. S. Atty.,

Washington, D. C., also entered appearances for appellee.

Before EDGERTON, WILBUR K. MILLER and WASHINGTON, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

The question before us is whether the District Court erred in discharging a writ of habeas corpus sued out by the appellant, Willie Fowler, to test the validity of an extradition order against him. More specifically, the questions are (1) whether he was in North Carolina, the demanding state, at the time he was alleged to have committed therein the crime of abandonment and nonsupport of his wife and minor children, and (2) if he was not there at that time, whether extradition is barred for that reason.

The history of the case begins in 1947, when Fowler's wife, Gertie Mey, sued him on September 29 in the United States District Court for the District of Columbia, seeking custody of their three infant children, and maintenance for them and herself. She alleged willful desertion on August 30, 1947, and that "since said date the parties have lived separate and apart without cohabitation." Both parties were, she alleged, residents of the District of Columbia. In that proceeding a judgment entered on March 24, 1948, awarded custody of the children to the wife, and ordered Willie to pay $10 each two weeks for Gertie Mey's support, and also to pay to "the children's maternal grandmother, Anna Owens, Route 5, Box 962, Charlotte, North Carolina, the sum of Thirty ($30.00) Dollars each two weeks toward the support of the infant children of the parties hereto."

In the same proceeding, an order entered October 10, 1949, recited that

"* * * the Court on its own Motion does believe that the final Order of March 24, 1948 should be modified to the extent that the defendant, Willie Fowler, should not have to pay $40.00 each two weeks for the support of his wife and children * * *."

and therefore modified the previous judgment "to the extent that Willie Fowler shall pay $30.00 each two weeks to Gertie May Fowler toward the support of the infant children of the parties hereto."

Soon after the entry of the first judgment on March 24, 1948, Gertie Mey took the three children to North Carolina, where she and they have since remained. The husband stayed in the District of Columbia until May 1, 1950, when he went to North Carolina to attend the funeral of a close relative. He was taken into custody there on that day under a warrant of arrest dated April 30, 1950, issued pursuant to Gertie Mey's complaint, sworn to by her April 29, 1950,

"* * * that on or about the 1st day of March, 1950, Willie Fowler with force and arms, at and in the County aforesaid, did wilfully, maliciously, unlawfully and feloniously Abandon and fail and refuse to provide adequate means of support for his wife Gertie May Fowler, and their three minor children: Regiland Fowler, age 13 years, Robert Fowler, age 14 years, Betty Jo, age 15 years. In violation of North Carolina Laws G.S. 14–322."

Immediately following his arrest on May 1, 1950, Willie Fowler was taken before the Domestic Relations Court of the City of Charlotte and Mecklenburg County, North Carolina, where the following judgment was entered:

"Defendant before the court charged with abandonment and nonsupport of his wife and three minor children.

"The defendant entered a plea of Guilty.

"The Court ordered a verdict of Guilty.

"JUDGMENT OF THE COURT IS, that the defendant be confined in the common jail of Mecklenburg County for a period of two years, assigned to work on the roads, under the supervision of the State Highway and Public Works Commission.

"This sentence is suspended upon the following conditions:

"That he pay into this court the sum of $50.00 today and that he pay into this court for the use and benefit of his wife

and children the sum of $40.00 each and every two weeks.

"These payments are to be credited upon the order obtained from the District Columbia [sic] and dated the 24th day of March 1948." [1]

Under the compulsion of the judgment imposing upon him two years of penal servitude, Fowler paid into the North Carolina court on May 1, 1950, the sum of $50 and was thereupon permitted to return to the District of Columbia.

Slightly more than a month later—on June 12, 1950,—the clerk of the Domestic Relations Court in Charlotte issued a *capias instanter* for violating the order regarding payments. It was not executed, as Willie was in the District of Columbia. Then, on July 12, 1950, the Solicitor of the Fourteenth Judicial District of North Carolina (which includes Mecklenburg County) filed with the Governor an application for a requisition in which he certified, among other things,

"4. That the accused was present in the State of North Carolina at the time the alleged offense was committed and thereafter fled the jurisdiction of this state;

* * * * * *

"12. That the said fugitive plead guilty to the charge of abandonment and nonsupport in the Domestic Relations Court, Charlotte, North Carolina, and was sentenced to serve two years on the public roads of Mecklenburg County, said sentence being suspended on certain conditions, which conditions the fugitive has failed and refused to comply with; exemplified

copies of the judgment rendered and capias issued in this matter are hereto attached."

Pursuant to this application, the Governor of North Carolina issued a requisition to the District of Columbia on July 13, 1950, upon receipt of which a district. judge[2] here issued a fugitive warrant for Fowler on August 22, 1950, and, on the same day, after reciting that he was "satisfied, after a hearing duly had, that the prisoner is the identical person mentioned in said requisition," the judge ordered extradition. So, Willie was surrendered to Ross, the North Carolina agent.

Immediately following the entry of the extradition order, on August 22, 1950, Fowler filed in the United States District Court here a petition for a writ of habeas corpus which contained, among others, the following allegations:

"2. I am a citizen of the United States and a resident of the District of Columbia for approximately 7 years immediately preceeding [sic] the present date.

"3. The respondent is the agent, attorney, or representative of the Governor of the State of North Carolina.

* * * * * *

"5. The complainant is one Gertie May Fowler, my wife, who is living separate and apart from me under decree in Civil Action 3931–47, in this Court.

"6. Under that decree I was Ordered to pay certain sums of money to the said Gertie May Fowler, for alimony and support of our children.

---

1. We observe that the North Carolina court ordered Willie to pay $40 each two weeks "to be credited upon the order obtained from the District Columbia [sic] and dated the 24th day of March 1948." That being the same sum which he had been ordered to pay by the District of Columbia judgment of March 24, 1948, to which that court referred, it seems probable that the court there was deliberately following the court here. It is apparent, however, that the North Carolina court did not know the District of

Columbia judgment of March 24, 1948, had been modified and the payments reduced to $30 each two weeks. Doubtless Gertie Mey presented a copy of the first judgment, but not of the second.

2. In the District of Columbia the Chief Judge of the United States District Court acts as the chief executive in requisition cases. 23 D.C.Code § 401 (1940). In case of his illness, absence or other disability, any judge of the District Court may be designated to act. 23 D.C.Code § 402 (1940).

"I have been occasionally delinquent in making these payments due to financial difficulties and a limited earning capacity and am presently approximately $30.00 in arears.

"7. Subsequent to the decree heretofore mentioned my said wife returned to North Carolina with the children—I remained in Washington, D. C.

"8. In May 1950 I went to Charlotte, N. C., to bury a close relative. While temporarily in North Carolina I was arrested on complaint of Gertie May Fowler, brought before a court where I was tried without counsel or opportunity for obtaining counsel and told I had entered a plea of 'Guilty' to the charges mentioned in the Governor's papers.

"9. Otherwise I have not been a resident of, or in the State of North Carolina since approximately 1943 or 1944.

\* \* \* \* \* \*

"12. Per the Order of this Court I have forwarded monies to the said Gertie May Fowler in the total sum of $50 during May, June and July of 1950—and subsequent to my arrest in North Carolina; and $50.00 to her while in the State of North Carolina."

The writ was issued and the appellee filed a return thereto in which he expressly admitted the allegations just quoted, thereby obviating the necessity that evidence be presented to sustain them. Hyatt v. People, etc. ex rel. Corkran, 1903, 188 U.S. 691, 711, 23 S.Ct. 456, 47 L.Ed. 657. The statements so made by the appellant and conceded by the appellee to be true were, therefore, the undisputed facts before the District Court at the habeas corpus proceeding. Hence, it clearly appeared that Fowler had not been in North Carolina since 1944 until he went there on May 1, 1950; and that, having separated in the District of Columbia August 30, 1947, he and Gertie Mey had lived separate and apart thereafter and were still separated when he entered North Carolina on May 1, 1950. Nevertheless, the trial judge filed these findings of fact and conclusions of law:

"1. That the petitioner, Willie Fowler, was ordered surrendered to the State of North Carolina as a fugitive from justice on August 22, 1950, Requisition No. 997, following a hearing by Judge Curran of this court.

"2. That the petitioner, Willie Fowler, is a fugitive from the State of North Carolina.

"3. That he is still under sentence in Mecklenburg County, North Carolina, on a charge of non-support of his wife and three minor children following a plea of guilty.

"Wherefore, The Court concludes as a matter of law:

"1. That the defendant is a fugitive from North Carolina and must be returned to that state to complete his sentence there.

"2. That the petitioner has been denied none of his constitutional rights."

Accordingly the writ was discharged and this appeal followed.

The extradition of fugitives from justice from one state to another is provided for in the Constitution of the United States and is governed by a federal statute enacted to make effective the constitutional provision. Article IV, Sec. 2, Cl. 2, of the Constitution of the United States provides that:

"A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

Title 18, § 3182, U.S.C. (1946), the statute which implements the constitutional provision, has been substantially in its present form since 1793. It is as follows:

"Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which

such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged. (June 25, 1948, ch. 645, 62 Stat. 822, eff. Sept. 1, 1948.)"

■ Thus one *charged* with crime in any state who flees from its justice to another state shall be extradited by the latter. Under no other circumstances is extradition authorized. It has therefore been consistently held, as we said in Johnson v. Matthews, 1950, 86 U.S.App.D.C. 376, 182 F.2d 677, that in a habeas corpus proceeding involving extradition the subjects of inquiry are: (a) whether a crime has been substantially charged in the demanding state; (b) whether the prisoner is the person so charged; (c) whether the prisoner was in the demanding state at the time of the crime.

■ How is the trial court to determine whether a prisoner, charged with committing a crime in a demanding state, is a fugitive from its justice? The test announced by the Supreme Court is obvious and simple. He is a fugitive from justice if he was in the demanding state when the crime was charged to have been committed; if he was not there then, he is not a fugitive and should be released. A leading case on this proposition, from which the Supreme Court has never departed, is Hyatt v. People, etc. ex rel. Corkran, 1903, 188 U.S. 691, 23 S.Ct. 456,

47 L.Ed. 657. There a proceeding for habeas corpus was commenced by Corkran in a New York state court to obtain his discharge from imprisonment by the respondent, the chief of police in Albany, who held him under a warrant issued in extradition proceedings by the Governor of New York. The lower courts refused to discharge Corkran from custody but the Court of Appeals of New York reversed and ordered him released. A writ of error brought that judgment to the Supreme Court of the United States for review.

It was stipulated at the habeas corpus proceeding that there were attached to the requisition from the demanding state of Tennessee copies of three indictments which were found on February 26, 1902, and that the alleged crimes were charged therein to have been committed on May 1, 1901, May 8, 1901, and June 24, 1901, respectively. Further, it was conceded of record that Corkran was not in Tennessee between May 1, 1889, and July 1, 1901, but was in that state on July 2, 1901. Thus the parties stipulated that Corkran was not in Tennessee when the crimes charged against him were alleged to have been committed. The Court said, 188 U.S. at page 711, 23 S.Ct. at page 458:

"We are of opinion that the warrant of the governor is but *prima facie* sufficient to hold the accused, and that it is open to him to show by admissions, such as are herein produced, or by other conclusive evidence, that the charge upon which extradition is demanded assumes the absence of the accused person from the State at the time the crime was, if ever, committed.
* * *

"If upon a question of fact made before the governor, which he ought to decide, there were evidence *pro* and *con* the courts might not be justified in reviewing the decision of the governor upon such question. In a case like that, where there was some evidence sustaining the finding, the courts might regard the decision of the governor as conclusive. But here as we have the testimony of the relator (uncontradicted) and the stipulation of

counsel as to what the facts were, we have the right and it is our duty on such proof and concession to say whether a case was made out within the Federal statute justifying the action of the governor. It is upon the statute that the inquiry must rest."

The opinion of the Supreme Court goes on to emphasize that to stand the test of habeas corpus, extradition must be justifiable under the federal statute. At pages 712 and 713, of 188 U.S., at page 459 of 23 S.Ct., the Court said:

"The exercise of jurisdiction by a State to make an act committed outside its borders a crime against the State is one thing, but to assert that the party committing such act comes under the Federal statute, and is to be delivered up as a fugitive from the justice of that State, is quite a different proposition.

"The language of § 5278, Rev.Stat. [18 U.S.C.A. § 3182] provides, as we think, that the act shall have been committed by an individual who was at the time of its commission personally present within the State which demands his surrender. It speaks of a demand by the executive authority of a State for the surrender of a person as a fugitive from justice, by the executive authority of a State *to which such person has fled,* and it provides that a copy of the indictment found, or affidavit made before a magistrate of any State, charging the person demanded with having committed treason, etc., certified as authentic by the governor or chief magistrate of the State or Territory *from whence the person so charged has fled,* shall be produced, and it makes it the duty of the executive authority of the State *to which such person has fled* to cause him to be arrested and secured. Thus the person who is sought must be one who has fled from the demanding State, and he must have fled (not

necessarily directly) to the State where he is found. It is difficult to see how a person can be said to have fled from the State in which he is charged to have committed some act amounting to a crime against that State, when in fact he was not within the State at the time the act is said to have been committed. How can a person flee from a place that he was not in? He could avoid a place that he had not been in; he could omit to go to it; but how can it be said with accuracy that he has fled from a place in which he had not been present? This is neither a narrow, nor, as we think, an incorrect, interpretation of the statute. It has been in existence since 1793, and we have found no case decided by this court wherein it has been held that the statute covered a case where the party was not in the State at the time when the act is alleged to have been committed. We think the plain meaning of the act requires such presence, and that it was not intended to include, as a fugitive from the justice of a State, one who had not been in the State at the time when, if ever, the offence was committed, and who had not, therefore, in fact, fled therefrom."

With the principle of the Corkran case in mind, we turn to the facts of the present case. Unquestionably, Willie Fowler was charged by Gertie Mey's affidavit[3] with the crime of abandonment and nonsupport of wife and minor children, alleged to have been committed in North Carolina on or about March 1, 1950. Unquestionably, he was not in that state on March 1, 1950, nor at any time after 1944 until he entered the state on May 1, 1950. The District Court here, therefore, should have ordered him released unless for some reason the rule of Hyatt v. Corkran is inapplicable. There are three such reasons, says appellee. We shall discuss them in the order stated by him.

---

3. It should be noted that the statute, 18 U.S.C. § 3182, requires a copy of the complainant's affidavit—not a copy of the warrant of arrest—to be attached to the requisition. On habeas corpus, the court had to determine whether the affidavit charged the commission of a crime committed by Fowler while he was in North Carolina. That is why a copy of the accusation is required.

1. The appellee says:

"The Return and Answer of appellee, which was not controverted, established prima facie that appellant was substantially charged with a crime against the laws of North Carolina, that he was actually present in North Carolina at the time of the criminal offense, and that he departed thereafter"

and concludes that

"* * * There being no contrary evidence, the finding of the lower court of fugitivity was properly made."

The appellee thus contends that the *prima facie* showing, made by the requisition papers, of Fowler's presence in North Carolina on or about March 1, 1950, must stand because Fowler introduced no evidence to rebut or refute it. But appellee's admission that appellant was not in North Carolina at the time charged overcame and destroyed the presumption of his presence there which was created by the demanding papers. Proof was therefore unnecessary to rebut the presumption. This was expressly held in the Corkran Case, 188 U.S. at page 711, 23 S.Ct. 456. One who stipulates that his opponent's allegation is true cannot later complain that it was not proved.

2. Appellee's second contention is that, even if Fowler was not in North Carolina on March 1, 1950, or on any subsequent day until he arrived there on May 1, 1950,

"* * * he might be convicted on the later date, as he was on May 1, 1950, in the State and failing to support his wife and children. The Government is not limited to proof of an offense on the exact date charge[d]."

From this, appellee deduces Fowler's presence in North Carolina at the time the offense was alleged to have been committed. In other words, the appellee's statement just quoted in effect says the complaining affidavit of April 29 can be construed as charging that, in North Carolina on May 1, 1950, Fowler abandoned his wife and children without making adequate provision for their support.

Whether Fowler might be convicted on May 1, 1950, because he was then in the state and perhaps did not support his wife and children on that day, was not material on habeas corpus. So far as May 1 is concerned, the question is not whether he might be convicted—indeed, he was convicted!—but whether Gertie Mey's affidavit substantially charged him with committing the crime of abandonment and nonsupport on that one day when he was in North Carolina. We are clear that the affidavit did not charge the commission of the crime on May 1 within the meaning of the federal statute—which of course has reference to a valid legal charge—because the complaining affidavit was made by Gertie Mey two days before May 1. A crime cannot be charged *in futuro*. An indictment or affidavit of complaint which purports to do so is bad on its face and in legal effect charges nothing. Certainly it is not a charge of crime which will sustain an extradition order challenged by habeas corpus.

But, as the statute expressly makes this a continuing crime, the appellee says, "Presence in the state at any time while the statutory duty of support was being neglected, would be sufficient." Appraisement of this argument requires consideration of the pertinent statute, North Carolina General Statutes § 14–322, the text of which is:

"If any husband shall willfully abandon his wife without providing her with adequate support, or if any father or mother shall willfully abandon his or her child or children, whether natural or adopted, without providing adequate support for such child or children, he or she shall be guilty of a misdemeanor: Provided, that the abandonment of children by the father or mother shall constitute a continuing offense and shall not be barred by any statute of limitations until the youngest living child shall arrive at the age of eighteen years. (Rev., s. 3355; Code, s. 970; 1868–9, c. 209, s. 1; 1873–4, c. 176, s. 10; 1879, c. 92; 1925, c. 290; 1949, c. 810; C.S. 4447.)"

To violate the foregoing statute one must, in North Carolina, willfully abandon his

wife or children without providing adequate support. Abandonment does not violate it unless followed by nonsupport; and nonsupport does not constitute the offense unless preceded by abandonment. Both essential elements must exist to constitute the crime. This plain meaning has been repeatedly recognized and declared by the Supreme Court of North Carolina.

In State v. May, 1903, 132 N.C. 1020, 43 S.E. 819, the defendant had been tried and convicted under a count of an indictment which charged him with willfully abandoning his wife and children.[4] The court said:

"* * * A comparison of the indictment with the section of the Code under which it was drawn shows a fatal defect, inasmuch as it charges a simple abandonment, without a failure to support. In legal effect, it charges no offense whatever, because it fails to charge the acts necessary to constitute an offense. State v. Hopkins, 130 N.C. 647, 40 S.E. 973 [1902]."

The opinion in the Hopkins case, cited by the court, said, 40 S.E. at page 974:

"* * * To constitute the criminal offense, there must be both an abandonment and a failure to support. One without the other does not constitute the criminal offense * * *."

The North Carolina court held in State v. Carson, 1947, 228 N.C. 151, 44 S.E.2d 721, that the husband's act becomes criminal when and only when he, having willfully or wrongfully separated himself from his wife, intentionally and without just cause or excuse, ceases to provide adequate support for her. In State v. Gilbert, 1949, 230 N.C. 64, 51 S.E.2d 887, a conviction was reversed because the trial court's charge omitted the element of willful abandonment as a necessary predicate for a verdict of guilty.

In this connection the appellee cites State v. Hinson, 1936, 209 N.C. 187, 183 S.E. 397, as authority for his statement that

"* * * even if appellant had never set foot in North Carolina before May 1, 1950, and on that date he was physically there and failing to support his wife and children, he would be amenable to the nonsupport law, the offense being one 'which continues day by day.'"

That was a case in which Hinson and the complaining witness, residents of North Carolina, journeyed to Baltimore and were married. Both returned home. Hinson contended that the abandonment occurred in Maryland, but the court did not expressly so hold. If its opinion is construable as holding nonsupport in North Carolina, following abandonment in Maryland, to be a violation of the statute, it is not only clearly wrong but also in conflict with the other North Carolina decisions to which we have referred, which clearly and correctly hold that both elements of the offense must be charged and proved to have been committed in North Carolina.

■ A further word should be said with respect to the appellee's contention that by entering North Carolina on May 1, 1950, and not instantly providing adequate support for his wife and children, Fowler committed on that day the "continuing crime" of abandonment and nonsupport, and that Gertie Mey's affidavit so charged. A crime defined as continuing in nature must begin before it can continue. This particular dual crime is not committed—is not begun—unless the husband willfully abandons his wife and children in North Carolina.[5] The language of the statute and the cases already cited demonstrate that fact. So, abandonment in North Carolina must precede failure to provide adequate support before nonsupport can be

---

4. The statute was then worded as follows: "If any husband shall willfully abandon his wife without providing adequate support for such wife, and the children which he may have begotten upon her, he shall be guilty of a misdemeanor".

5. In addition to the North Carolina authorities already cited, we find that the

Supreme Court of Nevada, in Ex parte Roberson, 1915, 38 Nev. 326, 149 P. 182, L.R.A.1915E, 691, held that Roberson, who had been requisitioned by North Carolina for violating this statute, was not extraditable because it clearly appeared that the abandonment did not occur in North Carolina.

said to be a day by day repetition of the offense. Both essential acts must take place in North Carolina, under the decisions of that state and under the ruling of the Corkran case that a state cannot, for the purposes of the federal extradition statute, declare an act done without its border to be a violation of its criminal laws.

We therefore conclude that Fowler was not charged with committing the dual crime on May 1, 1950, even if the affidavit be construed as a valid charge of nonsupport alone on that day. Moreover, as we have shown, the affidavit of April 29 could not be a valid charge of a crime to be committed two days later; with respect to what happened on May 1, the affidavit was nothing more than a prediction of things to come.

Daugherty v. Hornsby, 5 Cir., 1945, 151 F.2d 799, is not "on all fours with the one at bar," as appellee asserts. In that case it was clear that Daugherty committed the initial and essential act of abandonment while he was in the demanding state of North Carolina.

█ After the foregoing discussion of appellee's second contention that the affidavit substantially charged Fowler with abandonment and nonsupport at a time when he was in North Carolina because he was there on May 1, 1950, and on that day did not support his wife and children, we think it well to summarize the situation, as follows: The affidavit of April 29, 1950, charged abandonment and nonsupport in North Carolina on or about March 1, 1950, which for the present discussion we shall regard as elastic enough even to include the then future date of May 1, 1950. According to Gertie Mey's own statement, Willie deserted her August 30, 1947, in the District of Columbia, after which it is conceded they remained separate and apart. That statement and the concession make it impossible to construe Gertie Mey's affidavit as validly charging Willie with having abandoned her in North Carolina, either on March 1, when he was not there, or on May 1, when he was there, or at any time. Moreover, if the affidavit could be and were regarded as a valid charge,

though *in futuro*, of nonsupport alone committed on May 1, it was not a charge of the statutory crime which, though a continuing one when once committed, must be initiated by abandonment in North Carolina before it can be continued.

3. In stating his third reason for contending the District Court correctly held Fowler to be a fugitive, the appellee concedes that he was not a fugitive "in the first instance" because he was not in North Carolina when the crime was committed. The appellee thus virtually abandons his previous arguments, which we have just discussed, that Fowler *was* in North Carolina when the crime is alleged to have been committed. The appellee says in his brief:

"Although not a fugitive from justice in the first instance, by reason of physical absence from the demanding state, Hyatt v. New York, 1903, 188 U.S. 691 [23 S.Ct. 456, 47 L.Ed. 657], how can one who has made himself amenable to the judicial processes of that state by voluntarily entering, and who has accepted the conditions of a suspended sentence in preference to a two-year sentence which the state might rightfully have enforceed then and there, be said to be anything but a fugitive when he leaves thereafter?"

State ex rel. Lea v. Brown, 1933, 166 Tenn. 669, 64 S.W.2d 841, 91 A.L.R. 1246, certiorari denied 292 U.S. 638, 54 S.Ct. 717, 78 L.Ed. 1491, is cited by the appellee as a leading case on the subject. There it was conceded that appellants had not been in North Carolina, the demanding state, at the time the indictments alleged the crimes were committed. They knew they could avoid extradition on that ground, but nevertheless voluntarily appeared in the North Carolina court to answer the charges and were tried and convicted. Free on bond pending appeal, they went to Tennessee and refused to return to North Carolina when their appeal was unsuccessful. In those circumstances the Governor of Tennessee ordered extradition, which was upheld by the Supreme Court of that state on appeal in the habeas corpus proceeding brought to test the validity of the extradition.

■ The facts of the case before us differ decisively from those of State v. Brown. Here, Fowler did not voluntarily appear in the North Carolina court to answer the charge against him.[a] In fact he did not know he had been accused until he was seized, taken into court, told he had entered a plea of guilty and was sentenced. Consequently he did not waive the right to resist extradition, as did the appellants in the cited case.

An interesting feature of State v. Brown is that the Tennessee court unanimously upheld extradition but, in doing so, handed down two conflicting opinions, each of which represented the views of a majority of the five justices who composed the court. As a consequence neither can be said to have been the prevailing opinion. Neither can be considered the opinion of the court to any greater degree than the other, and the value of each is to be determined by appraising the soundness of its reasoning. One opinion, written by Justice Swiggart and concurred in by Justice Cook and Chief Justice Green, correctly said, 64 S.W.2d at page 844,

"* * * the only questions open for consideration in this proceeding are whether the relators are charged with crime in North Carolina and are fugitives from the justice of that state."

Although admittedly the relators were not in the demanding state on the dates charged in the indictments, the Swiggart opinion held they were fugitives nevertheless because they left North Carolina after conviction; and attempted to distinguish Hyatt v. Corkran by saying, 64 S.W.2d at page 844:

"* * * The only reason assigned by the court for the ruling made in that case [Hyatt v. Corkran], that one cannot be said to have fled from a state when he had not been there, is obviously not applicable to a person who has not only been in the demanding state but in custody of the court having jurisdiction of the crime charged, from which custody he has not been finally discharged. A case not within the reason of a ruling is not within the scope of its application."

It should be noted that the Swiggart opinion does not rest upon the ground that the appellants had waived extradition by voluntarily subjecting themselves to the North Carolina court's jurisdiction, but upon the ground that, because they were convicted in North Carolina it was immaterial that they were not there at the times the crimes were alleged to have been committed. Justice Swiggart apparently reasoned thus: (a) the relators were in North Carolina when they were tried and convicted; (b) they left the state thereafter; (c) therefore they were fugitives. But they were not fugitives in the sense of the constitutional provision and the federal statute unless they stood *charged* with committing crime in North Carolina while personally present there.

■ It is of course true that a person who has been convicted in a demanding state and has fled therefrom without satisfying the judgment against him may usually be extradited by the asylum state,[6] as may a paroled prisoner who leaves the state of conviction and violates his parole elsewhere.[7] But in such cases it is necessarily assumed by the extraditing authority that the prisoner had been convicted of crime charged to have been committed by him at a time he was personally present in the demanding state; and it is said that the charge is not swallowed up in the judgment of conviction but persists as such until the judgment has been satisfied and so is a basis for extradition under the federal statute. No decision has been found, except the Swiggart opinion in State v. Brown, which substitutes "conviction" for "charge" in the federal statute and upholds extradition when admittedly the prisoner was absent from the de-

6. United States ex rel. Farris v. McClain, D.C.M.D.Pa.1942, 42 F.Supp. 429; Hughes v. Pflanz, 6 Cir., 1905, 138 F. 980, 983.

7. Reed v. Colpoys, 1938, 69 App.D.C. 163, 99 F.2d 396, certiorari denied 305 U.S. 598, 59 S.Ct. 97, 83 L.Ed. 379.

manding state at the time the crime was alleged to have been committed.

The second opinion in State v. Brown, written by Justice Chamliss, concurred in by Justice McKinney and also concurred in by Chief Justice Green on the question of waiver, rejected the reasoning of the Swiggart opinion by saying, 64 S.W.2d at page 846:

> "Reliance is had [in the Swiggart opinion] upon the *appearance and conviction* of petitioners in the foreign state, without reference to the fact, heretofore taken to be essential, of presence in the demanding state *at the time when the crime was committed*. No case is cited, or has been found, where the courts have held or hinted that a charge or showing of conviction of crime in the demanding state may be treated as a substitute for the charge of presence when the crime was committed."

Justice Chamliss concluded that the appellants were extraditable as fugitives, not upon Justice Swiggart's theory that the conviction of appellants was an adequate substitute in extradition proceedings for the statutory requirement that they must have been charged with committing the crimes at times when they were in North Carolina, but upon the express waiver of their right to resist extradition on the ground of absence from the demanding state when the crime was charged to have been committed. This basis of the Chamliss opinion was thus stated, 64 S.W.2d at page 848:

> "So, following indictment in North Carolina, petitioners had the right to stay in Tennessee and, in response to extradition proceedings here, contest removal on the ground that they had not been physically within the demanding state at or about the time of the commission of the crime. This right was clear. But this record shows that petitioners, protesting their innocence and unwilling to rest under the charges, freely and voluntarily went into the state of North Carolina, waiving extradition, and presenting themselves there for trial in the courts and under

the laws of that state. They boldly and freely made their choice and relinquished their right to resist extradition."

We, too, reject the reasoning of the Swiggart opinion, as that of Justice Chamliss seems to us to have been the only sound basis for the conclusion reached. It is interesting to note that in Ex parte Taylor, 1936, 132 Tex.Cr.R. 29, 101 S.W.2d 579, 580, the Court of Criminal Appeals of Texas followed the case of State v. Brown as one

> " * * * in which the court held that by their voluntary act in going to the demanding state and submitting themselves to the jurisdiction of the court, the petitioners waived any right they originally had to resist extradition."

Thus the Texas court treated the waiver described in the Chamliss opinion as the true basis of the decision. The Court of Appeals of Alabama did likewise in Kay v. State, 1948, 34 Ala.App. 8, 37 So.2d 525, as did the Criminal Court of Appeals of Oklahoma in Fields v. State, 1943, 77 Okl.Cr. 1, 138 P.2d 124.

In the present case there was no waiver by Fowler of his right to resist extradition on the ground that he was not in North Carolina at the time Gertie Mey's affidavit charged he abandoned her and the children without providing adequate support.

The District Court's judgment will be reversed, and the cause will be remanded for the entry of an order releasing Fowler from custody.

Reversed and remanded.

WASHINGTON, Circuit Judge (dissenting).

The story of this case is a pathetic one. It is a drama that has been acted out countless times before. A husband cannot or will not support his wife and children, and when he enters the state that shelters them he is promptly arrested, tried and sentenced. That sort of treatment may or may not be a successful solution of the emotional and economic problems of the

parties: a term of years on the chain gang may do very little to "reform" the offender or satisfy the needs of his family.

That much may be granted. But criminal punishment is the remedy most states rely upon in such a case; we rely upon it, in fact, in this jurisdiction. D.C.Code §§ 22–902, 22–903 (1940). One who is convicted of abandonment and non-support is thus placed by the law in the same position as one convicted of burglary or murder; both are criminal offenders, and for purposes of extradition the one occupies no more favored status than the other. Nor does the court in its decision today distinguish between a Willie Fowler and a John Dillinger. The decision by its terms applies to every one convicted of crime: the court holds that if the criminal was not physically present in the state when the crime occurred, he can escape punishment by fleeing to some other jurisdiction, even after he has been rightfully arrested, tried and convicted.

The consequences of such a ruling are at once apparent. In our day, organized crime extends its tentacles throughout the Nation and beyond. A "Murder, Inc." may seek to operate over vast areas; so may schemes of fraud or theft. While some of these situations are the appropriate concern of the Federal Government, others must or should be dealt with by the several states. Now a new impediment is placed in the path of state law enforcement. If the leader of an interstate gang in New York procures the killing of a man in New Jersey, the New Jersey authorities can try him and punish him if he is ever seized within New Jersey's boundaries. There can be no doubt about that.[1] But today's decision means that, once caught, such a murderer is a bird that must be tightly caged: he must not be permitted to leave the state, for then the state can never obtain his return by extradition.[2] He must not be bailed or paroled beyond the boundaries of New Jersey; he must not be allowed a suspended sentence.[3] He may be a bail-jumper or a convicted criminal at large, but he is not a "fugitive from justice," because, forsooth, he was not within the boundaries of New Jersey at the time the crime was committed.

This strange result is without basis in principle or precedent. *This is the first court ever to reach or announce such a conclusion.* The Constitution and statutes on their face require the contrary. The conclusion embodied in the majority opinion must rest, in final analysis, on the view that the Supreme Court's dictum in Hyatt v. People, etc., ex rel. Corkran, 1903, 188 U.S. 691, 23 S.Ct. 456, 47 L.Ed. 657, must be taken with absolute literalness, and that unless the relator was within the demanding state at the time the crime was committed he cannot *under any circumstances* be extradited. The Hyatt case simply does not stand for that proposition. The relator in Hyatt had never been within the clutches of the demanding state: he was never apprehended, much less tried, within its borders. He had never been subjected to the arm of its justice, and hence was not a fugitive from that justice. The relator before us here was arrested, tried and convicted in North Carolina. He is now a fugitive from the justice of that state in the fullest constitutional and statutory sense. Every sound principle and precedent requires that con-

1. As Mr. Justice Holmes said in Strassheim v. Daily, 221 U.S. 280, at page 285, 31 S.Ct. 558, at page 560, 55 L.Ed. 735: "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power. Commonwealth v. Smith, 11 Allen 243, 256, 259; Simpson v. State, 92 Ga. 41, 17 S.E. 984, 22 L.R.A. 248; American Banana Co. v. United Fruit Co., 213 U.S. 347, 356, 29 S.Ct. 511, 53 L.Ed. 826, 832; Commonwealth v. Macloom, 101 Mass. 1, 6, 18." This follows even though the accused is kidnapped and brought within the jurisdiction by force and violence. Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509.

2. A premium would be put on obtaining his return by kidnapping or other violent means. Cf. Frisbie v. Collins, supra note 1.

3. One may well imagine the effect the court's decision will have on the treatment accorded future Willie Fowlers in North Carolina and elsewhere.

clusion. State ex rel. Lea v. Brown, 166 Tenn. 669, 64 S.W.2d 841 (opinion of Justice Swiggart, and authorities there cited), certiorari denied 292 U.S. 638, 54 S.Ct. 717, 78 L.Ed. 1491;[4] see also Strassheim v. Daily, 221 U.S. 280, 285, 31 S.Ct. 558, 55 L. Ed. 735; Ex parte Hoffstot, C.C., 180 F. 240, affirmed 218 U.S. 665, 31 S.Ct. 222, 54 L.Ed. 1201; United States ex rel. Miller v. Walsh, 7 Cir., 182 F.2d 264; Kay v. State, 34 Ala.App. 8, 37 So.2d 525. And see, generally, Johnson v. Matthews, 86 U. S.App.D.C. 376, 380, 182 F.2d 677, 681, certiorari denied 340 U.S. 828, 71 S.Ct. 65, 95 L.Ed. 608.[5]

The practical result of the decision today is to serve notice on state courts that their proceedings in cases of the present sort will become a mockery if they grant bail or any other measure of freedom to the prisoner. All he need do is to take the next train for Washington.

I would affirm.

4. In that case the Tennessee court refused to halt the extradition to North Carolina of Senator Luke Lea, who had returned to Tennessee after his trial and conviction by the North Carolina courts. The Supreme Court of the United States refused to review the case on certiorari. 292 U.S. 638, 54 S.Ct. 717, 78 L.Ed. 1491. On principle, and in its salient facts, that case appears to me identical with the case at bar.

5. Whether the relator was within the boundaries of North Carolina at the time the offense was committed was a question for decision in the first instance by the courts of that state; they may, in fact, have regarded it as an immaterial question, once the relator became personally subject to the justice of North Carolina, for an offense properly punishable there. Cf. State v. Hinson, 209 N.C. 187, 183 S.E. 397. In any event, it has become in this case a question of the kind which this court should not (and in fact cannot) consider in an extradition proceeding under the Johnson case, supra.